JOHN KILIOI MILLER, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 25836

February 29, 1996         911 P.2d 1183

*Morgan D. Harris,* Public Defender, *Robert L. Miller,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy, *David Bruce Barker,* Deputy, Clark County, for Respondent.

# OPINION

*Per Curiam:*

## FACTS

On May 8, 1993, Robyn Goring ("Goring") was stabbed to death in the apartment she shared with appellant John Kilioi

Miller ("Miller") and their two children. Maria Jordan ("Jordan"), an officer on the Las Vegas police force, lived in the apartment directly below Goring and Miller's apartment. Jordan heard loud noises in the apartment above her on May 8, 1993. When Jordan went to the upstairs apartment, Miller opened the door and stated something to the effect that "I blew it" or "I lost it." Jordan noticed blood on Miller's clothes, two children in the apartment's living room and the body of a young woman on the kitchen floor.

Officers responded to a 911 call by Jordan and observed Goring's body on the kitchen floor with a knife protruding from her torso. While being transported to the police station, Miller stated that he did not deserve to be treated nicely. Before and after Miller was informed of his *Miranda* rights, he volunteered incriminating statements. Miller stated, "I lost control and I just picked her up," and "I'm sorry. I don't want to live anymore. Shoot me." Also, Miller's shirt and the bottom of his pants appeared to be bloodstained.

The medical examiner's office found a total of forty-two stab wounds, many superficial, inflicted upon Goring's body. On June 10, 1993, Miller was charged with first degree murder with the use of a deadly weapon. At trial, Goring's mother and sister testified that Goring lived with Miller for twelve years, but was planning to leave Miller because he oppressively controlled Goring's life and was physically violent toward her.

Thomas Bittker ("Bittker"), an expert in psychiatry, testified regarding Miller's history of seizures and other symptoms that are indicative of depression. Bittker noted that Miller's medical history "conspicuously lacked" any evidence of amnesia or a violent episode associated with a specific seizure. Bittker concluded that no clear evidence existed to connect Miller's seizure disorder with the killing of Goring. The parties stipulated that if Bittker was recalled as a witness, he would conclude that Miller was sane at the time of the murder.

Norton Roitman ("Roitman"), a certified psychiatrist, diagnosed Miller as suffering from organic aggressive and delusional behavior, a seizure condition that was first recognized by dysfunctional brain wave activity when Miller was twenty-two years old. Miller's aggressive outbursts started early in his life and resulted in rage that was totally out of proportion to the stimuli. According to Roitman, Miller's personality condition is directly related to his seizure activity. But for this condition, Roitman concluded that the attack on Goring would not have occurred. Roitman also concluded that when Miller stabbed Goring, he could not appreciate the nature of his acts and could not recognize

the difference between right and wrong. Also, according to Roitman, Miller can only understand what he is doing before the violence is triggered, whereupon his outburst is not structured, but has a flaring, slashing quality. Remorse then sets in when the violent outburst subsides. In conclusion, Roitman stated that Miller was not sane at the time of the stabbing.

Austin Moody ("Moody"), a certified neurologist, testified for the defense and agreed with Roitman regarding Miller's abnormal brain activity and personality disorder. Moody believed that Miller suffers from an aggressive brain disorder whereby violence can be triggered quickly and end quickly, immediately followed by remorse. Moody concluded that before the stabbing of Goring, Miller was sane; but during the stabbing, Miller could not appreciate the nature of his actions and was insane.

Dr. Jack Jurasky, a psychiatrist who testified for the prosecution, concluded that Miller's outburst was of such a violent nature that he could not have appreciated the nature of his actions when he stabbed Goring.

Miller's sister, Annie Pedro ("Pedro"), testified that on one occasion, Miller hit their brother ten times in an outburst that ended as abruptly as it began. Afterwards, Miller was very remorseful. On another occasion, according to Pedro, Miller struck her numerous times and immediately apologized, not knowing why he hit her. Miller's father testified that Miller did not remember attacking Goring and that there were a lot of things his son did not remember.

At the close of the guilt phase of the trial, the jury found Miller guilty of first degree murder with the use of a deadly weapon. At the penalty hearing, Miller was sentenced to life in prison without the possibility of parole.

Miller raises five contentions in this appeal: (1) whether the district court properly refused to give Miller's proffered jury instructions regarding the insanity defense, (2) whether the prosecution's and the district court's comments regarding temporary insanity unduly prejudiced Miller, (3) whether the prosecution's penalty phase argument for sympathy for the victim unduly prejudiced Miller, (4) whether the district court properly admitted hearsay statements of the victim, and (5) whether the district court properly admitted evidence of Miller's prior bad acts. Because we conclude that the denial of Miller's proffered instructions, coupled with the subsequent comments of the State and the district court regarding temporary insanity, confused the jury and unduly prejudiced Miller's trial, this opinion does not address Miller's latter three contentions.

## DISCUSSION

The M'Naghten test for insanity has been applied in Nevada since 1889. State v. Lewis, 20 Nev. 333, 22 P. 241 (1889). To prove a defendant is insane under the M'Naghten test, the defense must show that the defendant labors under such a mental defect that the defendant cannot understand the nature of his actions, or cannot tell the difference between right and wrong. *See* Kuk v. State, 80 Nev. 291, 298-99, 392 P.2d 630, 634 (1964) (explaining the holding of *Lewis*). Because a finding of criminal liability requires a conclusion that a defendant's culpable mental state existed contemporaneously with a culpable act, a successful insanity defense must show the elements of M'Naghten existed *at the time of the act. See* United States v. Fox, 95 U.S. 670, 671 (1877).

In the trial below, Miller's defense theory was that he was sane before and after killing Goring, but was insane during the actual killing. Three medical experts testified that his mental condition made him prone to fall into violent seizures while completely sane. Further testimony showed that Miller could then act extremely violent with no ability to appreciate the nature of his actions, but would come out of the seizure acting deeply remorseful upon realizing the nature of his conduct. Miller presented evidence that on May 8, 1993, he fell into a violent seizure, stabbed Goring forty-two times, and then came out of the seizure consumed with remorse. Three medical experts concluded that Miller satisfied the M'Naghten insanity test during the period in which he stabbed Goring.

At the close of evidence in the trial below, the district court instructed the jury to determine whether Miller was legally insane when he killed Goring. The district court also instructed the jury that a finding of insanity required proof that at the time Miller killed Goring, he was laboring under a defect of the mind that caused him not to understand the nature or quality of his actions, or that what he was doing was wrong. Finally, the district court instructed the jury to consider Miller's mental condition before and after the killing to throw light on what Miller's mental condition was at the time of the killing.

Concerned that the jury was confused about the time duration component of the insanity defense, Miller proffered two jury instructions. The first proffered instruction was entitled "temporary insanity" and stated that "[r]egardless of its duration, legal insanity which existed at the time of the commission of the crime is a defense to the crime." The second proffered instruction stated that when evidence shows that at times the defendant was legally

insane and at other times he was legally sane, he has the burden of proving by a preponderance of the evidence that he was legally insane at the time of the commission of the act. The district court denied Miller's proffered instructions, ruling that the instructions described temporary insanity and that temporary insanity is not a defense in Nevada.

On two occasions during closing arguments in the guilt phase of Miller's trial, the prosecutor told the jury that temporary insanity is not a recognized defense in Nevada. On one occasion, the prosecutor stated that "[o]n defense's closing you heard about organic aggressive syndrome in relation to temporary insanity or insanity in general. Again, there's no such thing as temporary insanity in this state. It does not exist." The district court endorsed the prosecutor's statements by overruling Miller's objections to the statements and proclaiming, "He [the prosecutor] can argue that it's not a defense under the law."

The district court based its denial of Miller's proffered instructions, and its allowance of the prosecutor's statements regarding temporary insanity, on this court's decisions in Fox v. State, 73 Nev. 241, 316 P.2d 924 (1957), and Singleton v. State, 90 Nev. 216, 522 P.2d 1221 (1974).

In *Fox,* the defendant sought a jury instruction that evidence of a mental defect could lessen his degree of guilt even though he could not satisfy the M'Naghten test for insanity. *Fox,* 73 Nev. at 242-43, 316 P.2d at 925. In essence, Fox was requesting a diminished capacity defense. *Id.* at 243, 316 P.2d at 925. The *Fox* court denied the use of diminished capacity as a justification for a lesser degree of guilt. *Id.* at 245, 316 P.2d at 926. However, in so ruling, the *Fox* court characterized Fox's defense as that of "temporary insanity." *Id.* at 242, 316 P.2d at 925.

In *Singleton,* this court cited to *Fox* and stated that "[a] mental disorder less than insanity does not itself destroy the capacity to premeditate or to entertain the requisite intent." *Singleton,* 90 Nev. at 220, 522 P.2d at 1223. Like *Fox,* the defense proffered in *Singleton* was not insanity for a temporary interval of time. *Id.*

We conclude that *Fox* and *Singleton* considered only the diminished capacity defense, a condition that can be present only in the *absence* of M'Naghten insanity. The diminished capacity defense, in states where it is recognized, requires only a showing of a mental illness that is partially responsible for the defendant's conduct. *See* State v. Wilcox, 436 N.E.2d 523 (Ohio 1982). The diminished capacity defense does not require a showing that the defendant could not appreciate the nature of his acts or determine whether his acts were right or wrong. *Id.*

Accordingly, we conclude that any implication drawn from the reference in *Fox* and *Singleton* to temporary insanity is misplaced and the spawning ground for substantial confusion. Clearly, a person can benefit from the M'Naghten insanity defense if he shows he was insane during the temporal period that coincides with the time of the crime. Flowers v. State, 139 N.E.2d 185, 196 (Ind. 1957). Technically and semantically, such a finding is temporary insanity. Therefore, if a defendant presents evidence of insanity during the interval that coincides with the commission of the crime charged, that defendant is entitled to a correct and complete instruction that insanity on a temporary basis can be a defense to the crime.

We conclude that the district court properly denied Miller's instructions when they were offered. The instructions given by the district court addressed the contemporaneous requirement of the M'Naghten rule. In two places, the instructions stated that the sanity of the defendant had to be determined at the time of the commission of the offense or crime. As such, the essence of Miller's proffered instructions were contained in the instructions given by the district court. *See* Collins v. State, 88 Nev. 168, 170, 494 P.2d 956, 957 (1972).

However, after the instructions were given, the district court and the prosecutor told the jury that "temporary insanity" is not a defense. Even though the jury instructions stated that insanity must be present at the time of the commission of the offense, the jury was not told that the duration of the insanity does not matter. The jury was not told that the insanity defense applied even if the evidence showed Miller to be legally insane at some time and yet legally sane at others.

We conclude that allowing the prosecutor to comment that "temporary insanity is not a defense" materially confused the jury. The jury was then faced with the dilemma of distinguishing between whether insanity existed "for the time interval" that coincides with the time of the criminal act or for a "temporary" time. While Miller's proffered instructions could have alleviated the jury's confusion, the district court refused to offer those instructions to the jury. Therefore, the denial of Miller's proffered instructions, coupled with the comments of the State and the district court regarding temporary insanity, prejudicially confused the jury.

## CONCLUSION

In this case, Miller presented competent evidence that he was

insane when he killed Goring, but was sane before and after the killing. Accordingly, Miller was entitled to a correct and complete instruction that excusable insanity, even for a short period, could be a defense to the crime. Moreover, comments of the prosecutor and the district court regarding the unavailability of temporary insanity as a defense in Nevada hopelessly confused the jury.

Accordingly, Miller's judgment of conviction is reversed and this matter is remanded for a new trial.[1]

---

[1]The legislature revised NRS 174.035 in 1995, thereby replacing the plea of not guilty by reason of insanity with the plea of guilty but mentally ill. 1995 Nev. Stat., ch. 637, § 5 at 2450. The amendment will not affect Miller's prosecution because the amendatory provisions are applicable only to offenses committed on or after October 1, 1995. *Id.* § 61 at 2485.